**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Brian S. Cohen, M.D., | : | Case No.: _____ |
| Aaron M. Roberts, M.D., | : | |
| James Troy Thompson, D.O., | : | Judge: |
| Great Seal Medical Group, LLC, and | : | |
| CohenOrthopedic LLC, | : | JURY DEMAND ENDORSED HEREIN |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| Adena Health System, | : | |
| Adena Medical Group, LLC, and | : | |
| Maximum Properties, LLC | : | |
| Defendants | : | |
| | : | |

**COMPLAINT**

Brian S. Cohen, M.D., Aaron M. Roberts, and James Troy Thompson, D.O. (the "Doctors"), Great Seal Medical Group, LLC and CohenOrthopedic LLC for their complaint against Adena Health System ("AHS"), Adena Medical Group, LLC[1] ("AMG" and, together with AHS, "Adena"), and Maximum Properties, LLC ("Maximum Properties") allege and aver as follows:

**NATURE OF THE CLAIM**

1.      This lawsuit concerns Defendants' efforts to secure and maintain a monopoly for inpatient and outpatient orthopedic/musculoskeletal surgery and related services delivered by orthopedic specialists within an integrated medical practice.  Defendants exert this monopoly, or have attempted to do so, both in their home county of Ross, and also in the broader market of

---

[1] Adena Medical Group, LLC is a wholly-owned subsidiary of Adena Health Systems which Adena Health Systems uses as the employer of physicians who work at Adena.

Ross, Pike, Jackson, Highland and Vinton counties. Adena has publicly stated these counters were its "Primary Market Area" in 2019 debt documents. Adena has worked to exert and maintain this monopoly to the detriment of doctors who wish to open competing practices, including Plaintiffs Brian S. Cohen, J. Troy Thompson, and Aaron M. Roberts ("the Doctors"), and entities that they own or participate in, including Great Seal Medical Group, LLC and CohenOrthopedic, LLC (collectively with the Doctors, "Plaintiffs").

2. Ultimately, Adena's conduct is also to the detriment of the residents of Ross County and the rest of the Primary Adena Market Area, who have been deprived of any meaningful choice in health care services, and is therefore precisely the type of anticompetitive conduct the federal antitrust laws were intended to prevent.

3. Adena has for many years operated the only hospital in Ross County, Ohio. It is also the dominant health system across the Primary Adena Market Area. Indeed, Adena operates the only hospital in four of the eight counties that comprise the Primary Adena Market Area.

4. Ross County and the rest of the Primary Adena Market Area are predominantly rural, poor, and medically underserved.

5. Adena itself has cited an "extreme need" for orthopedic services in the Primary Adena Market Area.

6. Despite this "extreme need," and despite Adena's stated purpose as a non-profit health care entity of promoting public health in southern Ohio, Adena instead has taken a series of steps over the past several years to block or delay the entry of additional orthopedic practices, and to secure a monopoly for itself in the market for orthopedic services in both Ross County and the Primary Adena Market Area as a whole. Adena engaged in such activity from 2019 until

March 23, 2023.  Adena has also attempted to expand this monopoly to include Fayette, Pickaway, Scioto, and Hocking County (the "Attempted Adena Monopoly Area").

7.      Specifically, Defendants have, among other predatory and anti-competitive conduct:

    a.   Imposed excessive non-compete restrictions on its physician employees, as a condition of employment, that were designed to prevent any departing physician from providing medical services of any type anywhere in the entirety of both the Primary Adena Market Area and the Attempted Adena Monopoly Area for a one-year period of time;

    b.   Manipulated their real estate lease and purchase arrangements specifically to block competition and not for legitimate business purposes, by both (1) specifically interfering with efforts to secure land on which the Plaintiffs could open a competing practice and (2) generally locking up land in desirable locations for a medical practice across the Primary Adena Market Area and the Attempted Adena Monopoly Area with use restrictions that prevent such land from ever being leased or sold to a competitor such as Plaintiffs;

    c.   Mandated that Adena physicians refer patients needing orthopedic services *only* to Adena orthopedic physicians, regardless of their professional judgment as to the patient's best interests, unless no physician at Adena is capable of performing the necessary procedure;

    d.   Following Plaintiffs' lawful resignation, targeted Plaintiffs to be fired prematurely, terminate their privileges so they could not provide medical

care, and cut off their patients from communication with the Doctors in violation of Ohio patient notice requirements, because it perceived Plaintiffs as the most likely departing physicians to form a competing orthopedic practice to Adena's;

e. Manipulated the legal process in its litigation against Plaintiffs to dissuade other health care entities from doing business with Plaintiffs through a joint venture or other similar arrangement; and

f. Engaged in predatory targeted advertising efforts designed to deter patients from seeking out the services of Plaintiff Cohen in the Primary Adena Market Area and the Attempted Adena Monopoly Market Area, now that Plaintiff Cohen's non-compete restriction has expired.

8. These and other actions by Defendants are in violation of Section 2 of the Sherman Act, which expressly prohibits such monopolistic conduct.

9. Defendants' actions have caused direct injury to Plaintiffs, who have sought, and continue to seek, to compete with Adena to provide orthopedic services in the Primary Adena Market Area and the Attempted Adena Market Area.

## **THE PARTIES**

10. Plaintiff Brian S. Cohen, M.D. is an individual who resides in Union County, Ohio.

11. Plaintiff Aaron M. Roberts, M.D. is an individual who resides in Pima County, Arizona.

12. Plaintiff James Troy Thompson, M.D. is an individual who resides in Fairfield County, Ohio.

13.    Plaintiff Great Seal Medical Group, LLC ("Great Seal Medical") is an Ohio limited liability company with its principal place of business at 11100 Plum Ridge Place, Plain City, OH 43064.

14.    Plaintiff CohenOrthopedic LLC ("CohenOrthopedic") is an Ohio limited liability company that owns a 46 parcel of real property in Ross County.  CohenOrthopedic's principal place of business is 11100 Plum Ridge Place, Plain City, OH 43064.

15.    Defendant Adena Health System is an Ohio nonprofit corporation with a headquarters at 272 Hospital Road, Chillicothe, Ohio 45601.

16.    Defendant Adena Medical Group is an Ohio limited liability company with its principal place of business at 272 Hospital Road, Chillicothe, Ohio 45601.  Adena Medical Group is a direct subsidiary of Adena Health System.

17.    Defendant Maximum Properties is an Ohio for profit limited liability company with its principal place of business at 272 Hospital Road, Chillicothe, Ohio 45601.  Maximum Properties is a direct subsidiary of Adena Health System.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction over the claims asserted in this litigation under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law, specifically, the Sherman Antitrust Act.

19.    This Court has venue over this action under 28 U.S.C. § 1391(b) and (d) because Defendants are an Ohio corporation and two Ohio limited liability companies whose principal places of business are located in this division of this District and a substantial part of the events or omissions giving rise to the claims in this case occurred in this District.

20.     This Court has personal jurisdiction over each Defendant because they are residents of this district and engaged in antitrust actions that were directed at Plaintiffs in this district.

## **FACTUAL ALLEGATIONS**

### ***Adena's Dominance in both Ross County and the Primary Adena Market Area***

21.     Throughout the relevant time period, Adena has held a dominant position in the market for health care services—and, specifically, orthopedic services offered in an integrated practice—in both Ross County and the Primary Adena Market Area.

22.     Maintaining this dominance is important because in 2019 Adena embarked on the construction of the Adena Orthopedic and Spine Institute ("AOSI). In connection with his project, Adena entered into agreements with Ross County which led to Ross County offering $83,270,000 in face amount of Hospital Revenue and Improvement Bonds as tax-exempt special revenue bonds which were to be paid exclusively out of funds paid to Ross County by Adena under a sublease and a promissory note. $68,789,345.84 in the proceeds from this offering were to be used to fund the construction of the AOSI. Adena having a monopoly position in the market for orthopedic services will help Adena to repay these bonds.

23.     Adena itself recognizes that the market for these orthopedic services is highly dependent on location. In the offering statement for the 2019 notes, Adena said its "Primary Service Area" was the cluster of Ross, Pike, Jackson, Highland and Vinton counties.

24.     Adena also identified a "Secondary Service Area" of Pickaway and Fayette County that are contiguous with Ross County and where Adena maintains a physical presence... Finally it identified a "Tertiary Service Area" of Scioto and Hocking County from which Adena regularly draws some patients, but does not have physical facilities.

25.     A map showing the various hospitals located in the Primary Adena Market Area and the Attempted Adena Monopoly Market Area is below:



26.     According to the United States Census, this area had the following population as of 2021 (the most recent year for which estimates have been released):

| County | Population |
| --- | --- |
| Ross | 76,891 |
| Pickaway | 59,533 |
| Highland | 43,354 |
| Jackson | 32,511 |
| Fayette | 28,906 |
| Hocking | 28,097 |
| Pike | 27,089 |
| Vinton | 12,696 |
| **Total** | **309,077** |

27.     Adena itself recognizes this as a relevant geographic market in the selection of these counties as the ones covered by the noncompetition covenants restraining the Doctors from competing with Adena.

28.     All of Adena's facilities are located within either the Primary Adena Market Area or the Attempted Adena Monopoly Market Area.

29.     Because orthopedic services sometimes involve procedures that must be performed in a surgical setting, up to and including surgery, it is necessary for a competitive group of orthopedists to have access to surgical facilities and potential inpatient admission privileges at a hospital.

30.     Adena's flagship facility is the Adena Regional Medical Center in Chillicothe, the county seat of Ross County, Ohio.  It is the only hospital open to the general public in Ross County, Ohio.[2]

31.     Adena Regional Medical Center has 157 medical/surgical beds, 12 ICU/CCU beds and 10 operating rooms.

32.     Adena also operates the AOSI out of the same campus.

33.     The AOSI is a five-story building on Adena's main campus offering advanced orthopedic, interventional pain management, spine/back, sports medicine, neurology, and podiatry services under one roof.

34.     In adjacent Pike County, Ohio, Adena operates Adena Pike Medical Center, which is a 25-bed Critical Access hospital.  This facility feeds patients to the AOSI.  There is no other hospital in Pike County, Ohio.

---

[2] Ross County also houses a Veteran's Administration Medical Center, but its services are limited to veterans.

35.     In Highland County, Ohio, Adena operates Adena Greenfield Medical Center, which is a 25-bed critical access hospital. This facility feeds patients to the AOSI. There is only one other hospital in Highland County, Ohio, which is Highland District Hospital which is also a 25-bed critical access hospital.

36.     In Fayette County, Ohio, Adena operates Adena Fayette Medical Center, which is a 25-bed critical access hospital. This facility feeds patients to the AOSI. There is no other hospital in Fayette County, Ohio.

37.     Over the entire five county Primary Adena Market Area there are only two competing facilities for Adena patients - Holzer Medical Center Jackson in Jackson County and Highland District Hospital in Highland County. According to Ohio Department of Health data, these two facilities have a combined total of 43 medical/surgical beds and only four operating rooms (all at Highland).

38.     The Attempted Adena Monopoly Area has two additional competing inpatient facilities for Adena patients — Hocking Valley Community Hospital in Hocking County, and OhioHealth Berger Hospital in Pickaway County. Hocking has two orthopedists who only work part-time at Hocking, while also practicing outside of the Adena Market area.

39.     According to Ohio Department of Health data, these four facilities spread over an approximately 3,863 square mile area currently only have a ***combined total*** of 85 medical surgical beds and 12 ICU/CCU beds.

40.     By comparison, Adena Health System has 244 medical/surgical beds and 18 ICU/CC beds.

41.     Similarly, Adena operates 16 operating rooms while all the competitors combined only total 13 operating rooms (Holzer Medical Center has no operating rooms).

42.     None of the competitors have an orthopedic doctor who practices full-time in the Adena Market Area.  Instead, Highland and Holzer each employ a part time orthopedist who also practices outside of the Primary Adena Market Area and the Adena Attempted Market Area and Hocking employs on a part-time basis two orthopedic doctors, both of whom practice outside of the Primary Adena Market Area and the Attempted Adena Market Area.  Since the expiry of their noncompetes, the Doctors have provided services on a part-time basis in the Primary Adena Market Area**,** but Dr. Cohen currently only provides surgeries outside of the Primary Adena Market Area.

43.     In contrast, Adena employs eight orthopedic doctors who practice exclusively in the Primary Adena Market Area and the Adena Attempted Monopoly Area.  Thus, Adena currently operates as employer for the majority of orthopedists employed in the Primary Adena Market Area and the Adena Attempted Monopoly Area.

44.     Much of the area in and around Ross County is designated as a Medically Underserved Area ("MUA") by the Health Resources and Services Administration of the U.S. Department of Health and Human Services.  Thus, the federal government has recognized that this area has limited access to medical care.

45.     Adena's 2021 Form 990 filed with the Internal Revenue Service notes that "[t]he per capita, median and mean household incomes in Ross County Ohio are much lower than the state and U.S. averages, but higher than the regional average.  Poverty rates are also higher than state and national averages, but lower than the rest of the region."  More than 10% of the population of Ross County is estimated to be functionally illiterate or lacking reading and writing skills sufficient for practical needs. In other words, Ross County is economically distressed and surrounding counties are even more distressed.

46.     The Form 990 also discloses that "Ross County and its entire surrounding service region have a higher prevalence of disability than the rest of Ohio." Not only is the population poorer than average, it is also "an aging population which results in Medicare" being Adena's largest payor." In the notes to the offering memorandum for its 2019 bonds, Adena claimed that Ross County ranked 77th out of 88 counties in Ohio for health outcomes.

47.     Because this MUA is a poor area, a disproportionately high share of patients have government provided insurance through Medicare or Medicaid or are uninsured entirely. Medical providers compete for these government insured patients not on price, but based on reputation for quality and the convenience for patients to access their services. Some of these patients have limited access to transportation, which thus means that they have a strong preference for obtaining service in the county they reside or an adjacent one and will not or cannot drive further afield for services.

48.     Adena itself recognizes that this area has an acute shortage of orthopedic services. Indeed, Adena included in the letters of intent outlining the terms of employment for recently-hired orthopedic, sports medicine, and physiatry doctors statements that ███████████

█████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

49.     In short, Adena dominates the market for orthopedic services in the relevant geographic market and had a strong chance to gain a monopoly in the Adena Attempted Monopoly Area.

50.     Adena controlled ██████ of the orthopedic market share in Ross County (the most populace county in the Primary Adena Market Area) in 2018-2019.   No single competing hospital system held more than ██████ of the market for orthopedic services.

51.     This diffuse competition meant Adena's market dominance was even greater than suggested by its raw market share.

52.     Adena also has by far the largest market share for orthopedic services across the relevant geographic markets and, again, its share in this market vastly exceeds that of its nearest competitor.  For the Primary Adena Service Area from 2019 through 2021, Adena performed almost ████ by charges of all orthopedic services in that Market Area, thus exceeding all of its competitors put together.  When the Adena Attempted Monopoly Area is added on to the Primary Adena Service Area, Adena accounts for ████████████ charges from 2019-2021, which is again larger than any competitor.

***Adena Has Acted to Protect This Dominance***

53.     Despite the fact that it operates in an underserved medical area and it has a mission in its charter as a nonprofit to promote medical care, Adena has sought to limit competitor access to this market in recent years.

54.     For example, in September 2019, Adena learned that Kettering Hospital, based in Dayton, Ohio was interested in acquiring Fayette Memorial Hospital, one of the few non-Adena hospitals with a presence in the eight-county Primary Adena Market Area.

55.     Adena moved quickly to prevent Kettering, a competitor for orthopedic and other medical services, from expanding its reach into the Primary Adena Market Area through the acquisition of Fayette Memorial Hospital.

56.     To that end, Adena executives ████████████████████████████████████
████████████ .

57.     In January 2020, Adena announced that it was negotiating to acquire Fayette Memorial Hospital itself. After some delays caused by the global COVID pandemic, negotiations were completed. Adena's Board then met to approve the purchase ████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ The Board concluded that ████████████████████████████████

58.     Adena's purchase of Fayette Memorial Hospital closed in the spring of 2021. As part of that purchase, Adena prohibited Fayette County from allowing **any county owned real estate** to be leased or sold to a competing health care provider.

59.     In January 2021, Adena ████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████
      ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████
      ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

62.     ████████████████████████████████████████████████████
████████████████████████████████████████

63.  █████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████

64.  Adena subsequently consummated a lease of the Rural King space in Chillicothe,

thereby preventing OhioHealth or others from doing so.

65.  When OhioHealth announced its plans on April 13, 2021 for a medical office in a

different location in Chillicothe (a month after the Doctors tendered their resignation notices and

the day after they were fired by Adena), Adena ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████

66.  In the summer of 2021, Adena renegotiated its lease for ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████

67.  Adena worked to stop or delay its potential competitors from securing real estate

that could be used in a partnership between the Doctors and OhioHealth to construct a new

orthopedic/ambulatory surgery center. ██████████████████████████████████████

████████████████████████████████████████████████

68.  Adena CEO Jeff Graham's text communications reveal that he was afraid the

departing physicians would go to work at OhioHealth and pose a legitimate competitive threat to

Adena in Southern Ohio.

69.     Mr. Graham said as much in a March 17, 2021, text to Adena's Board Chairman, Joe Watson, in which he wrote, "█████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████ Earlier that day, Mr. Graham had texted Mr. Watson that █████████████████████████████████ Mr. Graham admitted when deposed in the state court case that he thought the Doctors were going to work with OhioHealth.  Accordingly, Mr. Graham and Chief Operating Officer Kathi Edrington, with Board Chair Watson's tacit approval, began developing a plan to shut down the Doctors' ability to plan for a re-entry into the Primary Adena Market Area following expiration of their non-compete restrictions.

70.     Two days after that, on Friday, March 19, 2021, ███████████████████ █████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████

71.     The Prairie Run North property sits on Hospital Road in Chillicothe, about a mile north of Adena's main campus and with easy access to State Route 23.  This was an ideal location for a competitor looking to move into Ross County and compete with Adena in offering orthopedic services.

72.     By the following Monday morning, March 22, 2021, Adena ███████████████ █████████████████████████████████████████████████████████████████ █████████████████████████████

73.     Adena had already had a special in-person board meeting scheduled for noon that day to discuss the Doctors' departure.  Prior to the meeting, Ms. Edrington prepared talking

points 

75.

76. The Prairie Run North parcel was

Indeed, the property in question is almost a mile away and not visible from Adena's main campus, so it is not a natural location for Adena expansion. However, it is an attractive location for other providers as it lies at the intersection of Route 23 and County Road 27, which makes it easy to access from throughout Southern Ohio.

77.     A Letter of Intent to purchase the land for ███████████████████████. This figure was ████████ more than OhioHealth and the seller had previously agreed upon and were in the midst of documenting in a binding Purchase and Sale Agreement. It was also ████████ more than the current listed asking price for the property (and even more than a previous unsuccessful effort to sell the property a few years earlier) .

78.     Although Adena funded the land purchase, it used Maximum Properties LLC as the nominal buyer to try and hide its activities from public scrutiny even omitting it from its IRS Form 990 returns through 2021 despite a requirement to include them.

79.     Maximum Properties LLC is a for-profit limited liability company wholly owned by Adena, but inexplicably omitted from the list of subsidiaries disclosed in Adena's public tax filings at the time.

80.     The Adena capital request memorandum prepared before the closing of the transaction as part of standard internal Adena recordkeeping stated that a primary reason for the purchase was to "████████████████████████████████

81.     Thus, there was no legitimate competitive purpose for Adena's sudden purchase of Prairie Run North—the real purpose was to block or delay the re-entry of the Doctors into Ross County.

***Adena's Use of Non-Compete Restrictions To Limit Competition***

82.     Adena hires its physicians, through Adena Medical Group, pursuant to written Physician Employment Agreements.

83.     Each of the Doctors had a Physician Employment Agreement with Adena.

84.     Adena officials have stated that has a matter of Adena policy, each and every employed physician must agree to Adena's standard set of restrictive covenants as a condition of employment.

85.     Adena doubled down on enforcement of this policy in 2019, requiring long-time employed physicians to agree to amendments adding restrictive covenants, where previously their contracts had not included any such restrictions.

86.     At least two long-time employed physicians, including Dr. Cohen, were threatened with termination of their employment if they did not agree to the added restrictions. Adena even backdated the amendment of Dr. Cohen's employment agreement to make it look older than it was.

87.     The restrictive covenants include restrictions on competition, solicitation of patients, and solicitation of employees.

88.     The non-competition restriction in the Doctors' Physician Employment Agreements prohibits each of them from providing medical services of any kind anywhere in the entire eight-county Primary Adena Market Area for a period of one year after ending their employment at Adena.

89.     Adena also requires its employed physicians to agree not to solicit patients or other employees for a period of one year after ending their employment at Adena.

90.     In some cases, Adena's Physician Employment Agreements also prohibits physicians from soliciting Adena referral sources for a period of one year after ending their employment at Adena.

91.     The practice of requiring employed physicians to abide by such restrictive covenants creates a barrier to competition, especially given the shortage of medical providers in

the Primary Adena Market Area, because new entrants cannot readily hire physicians locally, and physicians departing Adena pursuant to their contract provisions are forced to sever ties with their patients and referral sources for a one year period.

92.     There is no legitimate business reason for these restrictive covenants:  physicians perform their jobs based on the training and experience they brought with them to Adena, and are not generally privy to trade secret information or the kinds of "customer information" that have been used to justify the use of such restrictive covenants in other industries.  Instead, the point of these restrictions is to make it difficult for competition to enter the Primary Adena Market Area.

93.     Non-compete restrictions in particular have come under scrutiny in recent years, and are disfavored in the health care setting because they have a detrimental effect on patient choice.

94.     Indeed, the FTC recently announced a proposed rule invalidating the use of non-compete agreements across a wide range of industries, including the health care industry.

95.     Importantly, Adena has enforced its restrictive covenants selectively and self-servingly, only when it perceives a competitive threat from the departing physician(s).

96.     This practice of selective enforcement further illustrates that Adena is motivated by anti-competitive goals, and not out of a legitimate need or desire to protect trade secrets or other similar competitively-sensitive information.

97.     Indeed, when Adena itself sought to hire away physicians from competing practices in order to shore up its own market dominance, it opportunistically argued that such non-compete restrictions were unenforceable.  In contrast, Adena threatened the Doctors with legal action if they violated these provisions.

*Adena's Other Employment Practices Designed To Stifle Competition*

98.     Adena also recruits physicians to join Adena by offering to help pay off their student loans.

99.     This "benefit" is given in the form of a ███████.

100.    ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

101.    This practice makes it nearly impossible for newly-hired physicians to leave Adena ████████████████████████████████████████

████████████████████████████████████████

102.    Adena's practices in this regard further stifle competition because physicians cannot readily leave Adena to start their own independent practice groups without having to bear the financial consequences of Adena ████████████████████████.

103.    Adena also attempts to control the professional judgment of its employed physicians in order to steer business to Adena.

104.    Specifically, Adena's policy is to require its physicians to refer patients needing additional care from a specialist to make those referrals only to other Adena physicians.  (The only exception is if there is no Adena physician offering the necessary services.)

105.    Thus, for example, Adena's Board instituted a policy requiring ████████████████

████████████████████████████████████████

106.    One orthopedic physician who sought to refer a patient to a non-Adena specialist he believed was the best qualified to treat the patient reported that he was called into a meeting and reprimanded for attempting to make a referral to a non-Adena physician.

107.    The physician learned that, after he had told the patient about his planned referral, Adena contacted the patient behind his back and redirected the patient to an Adena physician, thus substituting Adena's judgment for that of the treating physician.

108.    There is no legitimate purpose for such conduct.  The only purpose was to shore up Adena's competitive dominance in both Ross County and in the rest of the Primary Adena Market Area by preventing its patients from receiving care from Adena competitors.

109.    Adena's anticompetitive practice even extend to how it pays out-of-network expenses for the health plans it provides to employees.  Adena employees receive ▇▇ coverage under the health plan if they go to Adena, ▇▇ if they go to Ohio State (who is involved in certain joint ventures with Adena), but only ▇▇ if they go to other providers who Adena perceives as competitors.  This policy discourages employees from going to competitors or potential competitors to Adeana.

110.    Adena's anti-competitive practices, described above and below, directly impacted each of the Doctors, causing them injury and financial losses by delaying and/or preventing their re-entry into the Ross County market and the rest of the Primary Adena Market Area.

***Adena's Reaction To The Doctors' Resignations Was To Stifle Competition.***

111.    Each of the three Doctors spent more than ten years providing orthopedic services at Adena.

112.    Dr. Cohen, an orthopedic surgeon, spent 20 plus years at Adena and was instrumental in the growth of the Adena Bone and Joint Group which ultimately moved into the AOSI.

113.    Dr. Cohen was the single most productive physician at Adena, and was sought after by many patients across the region for his surgical skills.

114.    Dr. Cohen also possessed surgical skills unique in the Ross County area:  apart from being the only shoulder surgeon at Adena (and therefore the only shoulder surgeon in Ross County), Dr. Cohen was also the only doctor regularly performing anterior cruciate ligament, posterior cruciate ligament, or medial collateral ligament knee surgery.

115.    Adena's own administrative leaders have uniformly conceded he was incredibly hard-working, an advocate for patient care, and generous with his time and money as to patients, staff, and the larger Southern Ohio Community.

116.    Dr. Aaron Roberts was a top non-operative sports medicine doctor in Southern Ohio and one of the busiest physicians at Adena.

117.    From the time he joined Adena in 2008 to his unexpected termination on April 12, 2021, Dr. Roberts provided a variety of high-quality non-operative orthopedic services to the residents of Ross County and surrounding counties.

118.    Dr. J. Troy Thompson was another top non-operative sports medicine doctor in Southern Ohio.

119.    From the time he joined Adena in 2010 to his unexpected termination on April 12, 2021, Dr. Thompson provided a variety of high quality non-operative orthopedic services to the residents of Ross County and surrounding counties.

120. For example, Dr. Thompson was the only non-operative sports medicine doctor at Adena (and therefore in Ross County) with specialized training in specific ligamentous injections for back injuries.

121. Dr. Thompson also was one of the main physicians in the group who sub-specialized in treating sacroiliac dysfunction with manual medicine, US procedures, and ligamentous injections. Dr. Thompson also sub-specialized in treating myofascial dysfunction including, but not limited to, fibromyalgia, polyarthralgia disorders, and other fascial connective tissue disorders, as well as non-operative pediatric orthopedics, an area in which he had undergone extensive training and earned significant trust in the community.

122. The three Doctors grew frustrated over time with the lack of support they received from Adena's administration.

123. Dr. Cohen, who had long served as the Medical Director for the orthopedic group at Adena, was abruptly demoted from that position in May 2020, triggering a fresh wave of unhappiness among the Doctors.

124. The Doctors decided to resign, and began negotiating with OhioHealth to become employed physicians there.

125. Because of the restrictive covenants, the Doctors and OhioHealth knew the Doctors would need to work outside the Primary Adena Market Area for the one-year period of the restriction.

126. However, they also began to plan, together with executives at OhioHealth working on OhioHealth's planned expansion into Southern Ohio, for their eventual re-entry into the Primary Adena Market Area. In doing so, the Doctors had to keep in mind that Adena would

terminate their medical privileges when they resigned employment and they would need to find alternative places to practice.

127.    Specifically, the Doctors discussed with OhioHealth the possibility of pursuing a joint venture together to open a competing orthopedic services and ambulatory surgery facility in Ross County upon the expiration of their Adena non-compete restrictions.

128.    OhioHealth real estate personnel, with input from Dr. Cohen, began scouting potential locations in Ross County.

129.    In December 2020, the former site director for the AOSI left Adena and went to work for OhioHealth.  Also in that month a general surgeon who was at Adena tendered his 120 day notice that he was resigning from Adena.  That employee subsequently joined OhioHealth.

130.    Mr. Graham and others in Adena's management became concerned that the Doctors and other employees may soon leave to work for competitors.  Mr. Graham confronted Dr. Cohen on no less than three occasions to press him about his future plans.

131.    In March 2021, the Doctors tendered their resignations.  Pursuant to their Employment Agreements, they were required to give 120 days' notice, which they did.

132.    In part because all three resigned at the same time and two prior employees who had resigned ended up at OhioHealth, Adena immediately suspected the Doctors were also planning to go to OhioHealth.

133.    As noted above, Adena had known that OhioHealth had been considering opportunities to enter Ross County and the Primary Adena Market Area.

134.    Adena's fear that the Doctors were going to go to a competitor and ultimately work with that competitor to set up a competing orthopedic practice in Ross County spurred a fresh slate of anticompetitive activity by Adena.

**Step 1: Adena Blocks OhioHealth's Planned Purchase of Prairie Run North As A Potential Future Site For The Doctors.**

135.    First, as discussed earlier, one of the first steps Adena took was to outbid OhioHealth for the Prairie Run North property to deny the Doctors a place to practice in the future.

136.    Because of Adena's 11th-hour rush to outbid OhioHealth for the Prairie Run North property, the joint venture under discussion between the Doctors and OhioHealth was quickly derailed.

137.    OhioHealth had to go back to the drawing board and seek out other potential parcels of land in Ross County, and begin negotiations anew.

138.    More than 18 months after Adena's predatory conduct derailed the imminent Prairie Run North acquisition, Dr. Cohen was eventually able to secure an alternative parcel. However, because of the delays caused by Adena, and other actions of Adena described below, OhioHealth declined to contribute to the purchase price (as had originally been planned).

139.    Dr. Cohen's individual practice, CohenOrthopedics, was forced to purchase the land itself.

140.    Moreover, the development project itself has been delayed by more than 18 months as a result of Adena's conduct, causing financial loss to Plaintiffs.

141.    While the original plan was to have a facility completed or nearing completion around the time the Doctors' non-compete restrictions expired in April 2022, the new facility now will not open until the end of 2024.

142.    Each of the Doctors was individually harmed by Adena's actions to interfere with OhioHealth's purchase of the Prairie Run North Property and other actions towards OhioHealth because these actions derailed and delayed the Doctors' plans to develop a competing orthopedic

services facility in Ross County. Great Seal Medical and Cohen Orthopedics were also harmed by these actions.

### *Adena's Premature Termination Of The Doctors And Misinformation Campaign*

143.    On April 12, 2021, Adena fired all three Doctors effectively immediately, less than 30 days into their 120 day notice period.

144.    Adena ambushed Dr. Cohen—who believed he had a full slate of surgeries scheduled—when he arrived at work that morning, terminated him, and escorted him from the building.

145.    Dr. Roberts, who was on vacation at the time, was terminated by email.

146.    Dr. Thompson likewise received an email communication notifying him of his termination.

147.    By terminating their employment effective immediately, Adena also automatically immediately terminated their credentials to treat patients at the Adena Regional Medical Center and other Adena facilities.

148.    This meant the Doctors were immediately unable to communicate with or treat any of their patients.

149.    In Dr. Cohen's case, that included patients on whom he had operated the previous week.

150.    In the case of Drs. Roberts and Thompson, that included patients with whom they had ongoing, long-standing physician-patient relationships, and ongoing patient care plans.

151.    Adena claimed it was firing them for breaches of Section 9 of their Employment Agreements, which contains the restrictive covenants—even though Adena has conceded there is no evidence that any of the Doctors violated their non-compete restrictions.

152.     Instead, Adena claimed the Doctors had breached the non-solicitation and confidentiality provisions of their Employment Agreements. (Those allegations are disputed and will be resolved in the parallel state court proceeding.) [3]

153.     Adena's firing of the Doctors effective immediately, with no notice or opportunity to cure, violated the termination provisions of the Employment Agreement. Section 8 of their Employment Agreements required written notice and 30 days in which to cure ordinary contractual breaches such as those set forth in Section 9.

154.     Adena did this specifically so that the Doctors would ***not*** have 30 days (or the full 120 days of their original notice period) to advise patients and staff of their plans to leave, or assist in the orderly transition of care for their patients.

155.     On the same day it fired the Doctors, Adena filed a lawsuit in the Ross County Court of Common Pleas against them which has been assigned Case Number 21 C 91. That lawsuit remains pending and is scheduled for a jury trial starting August 1, 2023.

156.     Adena choose to fire and sue the three Doctors, and not the other five orthopedic doctors who resigned during the same week, because it perceived these three as the greatest competitive threat to its market dominance in the Ross County area.

157.     Adena also elected to fire them for cause, rather than use the practice sometimes used by Adena or other medical systems of placing them on leave for the remaining term of the notice period.

---

[3] As described in paragraph 155, Adena sued the Doctors on the same day they were filed in state court. The Doctors' original counterclaim in the state court action included as Count 4 an antitrust counterclaim under federal law. On November 1, 2022, the State Court found that it lacked subject matter jurisdiction over the antitrust counterclaim and dismissed that claim without prejudice.

158.    These choices had significant negative consequences for the Doctors' ability to compete with Adena, as Mr. Graham and Adena well knew.

159.    Now, on every medical licensing renewal application, or application for a medical license in another state, the Doctors will be required to disclose that they were terminated for cause by a health system.  In Ohio, such a disclosure triggers an automatic investigation.  Dr. Thompson has already been subject to such an investigation.

160.    Moreover, an immediate termination meant the Doctors' privileges at the Adena Regional Medical Center terminated automatically, and they could not practice medicine anywhere until they were credentialed by another hospital, effectively ending their medical careers until privileges could be obtained elsewhere.  (In an orderly transition, the credentialing process at another hospital could have proceeded while the Doctors were winding down their practices at Adena.)

161.    The manner of termination also allowed Adena to claim it did not have to disclose to patients what became of the Doctors, where they were going to go to work, or how to contact them—all information a health system employer is normally required by Ohio statute to provide to patients when a physician leaves.  (The Doctors dispute that this was permitted regardless of the manner of termination, but Adena has pointed to it as an excuse.)

162.    Adena's failure to communicate appropriately with patients—including those on whom Dr. Cohen had operated just days before he was fired—has caused at least two complaints of patient abandonment to be filed against Dr. Cohen with the State Medical Licensing Board, resulting in investigations and subpoenas against him.  Dr. Cohen previously had had a stellar record with zero complaints to the State Medical Licensing Board in his 20+ year career.

163.     Mr. Graham and Adena, of course, were well aware of these injurious ramifications to the Doctors but chose this path anyway.

164.     On the day the Doctors were terminated, Adena distributed scripts to staff expected to be speaking with the Doctors' patients.

165.     These scripts directed Adena employees to make misleading and false statements regarding the Doctors' departure to sow maximum confusion and make it appear as though the Doctors had just walked off the job, abandoning their patients in contravention of their ethical and legal obligations.

166.     Adena's normal practice with departing physicians is to work with them on a communication to patients notifying them of the physician's impending departure, and providing information about how and where to contact their doctors in the future.

167.     As to the Doctors, however, Adena abandoned its normal practice and refused to provide the Doctors' patients with any information about how to contact them.

168.     Adena engaged in this conduct, and in the campaign of misinformation to the Doctors' patients, for the anticompetitive purpose of damaging the Doctors' ability to maintain or rebuild patient relationships upon the expiration of their restrictive covenants.

169.     This conduct further interfered with and harmed the Doctors' ability to re-enter the Adena Market Area and compete with Adena.

***Adena's Abuse of the Litigation Process To Deter Competition.***

170.     During this same time period following its firing and suing of the Doctors, Adena aggressively used the litigation it had initiated against the Doctors to try to pry, needlessly, into OhioHealth's general business plans and otherwise harass OhioHealth so as to harm the Doctors' relationship with OhioHealth.

171. In early 2022, Adena served a 40-request non-party subpoena on OhioHealth seeking a wide range of materials including OhioHealth's internal market studies and business plans, which had nothing to do with the Doctors. Among these requests was market data to which Adena already had access from the Ohio Hospital Association.

172. To maximize the harassment, Adena then requested that OhioHealth include three in-house counsel as custodian and run generic search terms such as "orthopedics" and "market share" untethered either to Adena or the Doctors.

173. Adena then engaged in an uncompromising meet and confer correspondence with OhioHealth, including a March 24, 2022 letter were Adena persisted in pursuing OhioHealth's internal market analyses, even if they were unrelated to the Doctors.

174. Meanwhile, Dr. Cohen had organized a meeting to be held March 31, 2022 between the Doctors and other physicians interested in the joint venture, the health care development consultants Dr. Cohen had been working with to develop preliminary pro formas for the project, and OhioHealth. On March 30, 2022, OhioHealth canceled the meeting because of pressure from Adena over the document subpoena. OhioHealth also stopped efforts to purchase real property for usage by the Plaintiffs because of the document subpoena.

175. OhioHealth is no longer participating in any discussions regarding a joint venture, imposing significant additional costs on the development of the project.

176. Now, Adena is attempting to do the same thing with the Plaintiffs' new partner, ValueHealth, serving it with an extensive and intrusive document subpoena and Rule 30(B)(5) deposition notice designed to harrass it and dissuade it from moving forward with its joint venture with Plaintiffs.

*Adena's Interference With Plaintiffs' Potential Consulting Relationships*

177.    As part of planning for the new, competing ambulatory surgery center, Dr. Cohen and CohenOrthopedics looked into possibly working with Sunday Creek Horizons, which is a consulting firm that provides government affairs services in rural and Appalachian communities like Ross County.

178.    In December 2022, Dr. Cohen and CohenOrthopedics explored a possible business relationship with Sunday Creek Horizons.

179.    In a sworn affidavit filed by Mr. McBee in the state court lawsuit he admitted that in December 2022, Zach Reizes, Sunday Creek's Vice President of Operations, relayed to Ty McBee that someone at Sunday Creek Horizons was contacted by a person or group that was working with several physicians who were in a dispute with Adena Health System.  Several days later he ran into Mr. Reizes at a social event where he asked what Adena would think about Sunday Creek working with that group of physicians.  Mr. McBee claimed in his affidavit that "I told Mr. Reizes that Adena would have to be cautious about business relationships that involved the doctor group because of the lawsuit."

180.    As a result of Adena's interference, Sunday Creek Horizons has not had any further discussions with Plaintiffs to work in connection with the new development project.

*Adena's Manipulation Of The News Media And Advertising*

181.    After Dr. Cohen formed CohenOrthopedics as part of his long-term plan to return to the Primary Adena Market Area, Adena engaged in advertising tactics designed to confuse and mislead patients and interfere with Dr. Cohen's legitimate efforts to compete.

182.    Specifically, Adena purchased Google ad placement for itself, triggered to appear when an internet user entered a search for Dr. Cohen and/or CohenOrthopedics.

183.    In other words, the ads are designed so that if certain Google users attempt to search for information about Dr. Cohen, they will instead be presented with ads for Adena and/or Adena's orthopedic services.

### Adena's Ongoing Misinformation Campaign

184.    Adena's CEO, Jeff Graham, has continued to spread false information about Dr. Cohen and his colleagues, including in various management meetings held as recently as June 19, 2023.

185.    In the June 19 meeting, for example, Mr. Graham falsely, and without any evidence whatsoever, told dozens of managers that Dr. Cohen and the other Doctors were behind social media attacks against Adena being published under the pseudonym "Blimp Arms."

186.    Mr. Graham falsely accused the Doctors of "bullying" Adena and Adena doctors, and falsely claimed that the Doctors' colleague (the former Adena site director who resigned shortly before they did) was terminated because she had "stolen" documents from Adena (when in fact she resigned and did not "steal" anything).

187.    Upon information and belief, the June 19 meeting was one in a series of similar meetings being held with groups of Adena personnel.

188.    These speeches are designed to dissuade others unhappy at Adena from leaving to go to a competitor, and further tarnish the Doctors' reputations as they seek to rebuild their medical practices in Ross County.

189.    Because of Adena's conduct described above, the Doctors' plans to construct a new, competing ambulatory surgery center and orthopedic facility in Ross County was delayed for more than a year. During that time, Adena's misinformation campaign and aggressive litigation tactics described above further dissuaded OhioHealth from pursuing any joint venture

or long term plans for Southern Ohio with the Doctors, and harmed the Doctors' reputations among patients and the larger Southern Ohio community.

## Antitrust Injury and Standing

190.     Adena's anticompetitive conduct was intended to drive the Doctors, Great Seal Medical, and Cohen Orthopedics from the Ross County market and surrounding areas for as long as possible.  Adena did so to try and continue its monopolization of both the employment market for orthopedic doctors to work in southern Ohio and the end-market for orthopedic services in southern Ohio.

191.     Adena's calculated firing of the Doctors in a way to maximize the disruption to their patients, defamatory statements about the truth regarding their departure, and refusal to send patient notices in the manner provided for by law were all designed to permanently sever the Doctors' relationships with their patients and to hamper their ability to compete with Adena for many years into the future.

192.     Adena's threat to enforce the noncompetition covenants and opposition to the Doctors' motion for a declaratory judgment on their enforceability meant that the Doctors had to comply with them and stay out of the area covered by them.  This barred the Doctors from working in the market where they had labored for many years, diminishing patient choice and quality of care.

193.     Adena's purchase of the Prairie Run property, the leasing of the Rural King space, and the expansion of the exclusive use provisions in Chillicothe barred prospective employers of the Doctors or the Doctors themselves from being able to use these spaces in the geographic market they historically served.  These moves delayed Plaintiffs' reentry into the market and

reduced the supply and accessibility of high-quality orthopedic services to patients in Southern Ohio.

194.    Adena's anticompetitive actions in purchasing property, defaming the doctors, pursuing the state court litigation, and intentionally pursuing aggressive discovery against OhioHealth even after the Doctors' noncompetition covenants have expired has indefinitely delayed and/or derailed the Doctors' plans to be part of Great Seal Medical's efforts to open a physician-owned ambulatory surgery facility focused on orthopedics on real estate leased from CohenOrthopedics that would compete with Adena.

195.    The Doctors suffered direct harm from being unable to earn the returns from opening a competing medical practice. Patients in turn have been harmed by having fewer and less qualified service options during the period the Doctors were prohibited from competing. Patients also have suffered since the noncompete period expired by the Doctors not having access to surgical space in Ross County, resulting in them getting lower quality medical care.

196.    The Doctors are also consumers in the employment market for orthopedic specialists in Southern Ohio. Adena's anticompetitive activities cost the Doctors' income by scaring potential employers away from employing the Doctors and reduced their potential earnings as new employers would not let the Doctors service their historic markets for the year they were subject to the noncompete. This disruption to the Doctors' patient relationships also made them less attractive to other employers because they would not be able to see patients who would otherwise seek them out for services.

197.    The Doctors suffered direct harm from Adena's actions to monopolize the market for orthopedic services in Southern Ohio, as they were denied the opportunity to work in that market for a year and were less attractive to employers because of this.

198. No other party is likely to sue for this harm and there is no need to apportion this recovery among other plaintiffs.

**Causes of Action**

**Count I –Actual Monopolization of the Market for
Orthopedic Services under Section 2 of the Sherman Act**

199. The allegations included in paragraphs 1 to 198 above are incorporated herein.

200. The relevant product market is the market for inpatient and outpatient orthopedic/musculosketal surgery and related orthopedic services delivered by orthopedic specialists within an integrated orthopedic medical practice.

201. The relevant geographic market is Ross County and the remainder of the Primary Adena Service Area of Ross, Pike, Jackson, Highland and Vinton counties

202. Adena's market share of over 60% in Ross County for orthopedic services, which is the largest county in this cluster, shows that it has monopoly power in this market. Adena also has an over 50% market share for orthopedic services in the entire Primary Adena Service Area.

203. Adena has also shown that it has monopoly power in this market by its dominant market share in terms of inpatient beds and procedures in this market.

204. Adena and Maximum Properties have engaged in anticompetitive conduct to acquire or maintain this market monopoly power by acquiring real estate to block competitors.

205. Adena also engaged in anticompetitive conduct by selectively enforcing noncompetition covenants for the Doctors to bar competitors from hiring them to work in the market, defaming the Doctors to destroy their reputation in the market, using litigation and abusive discovery to deter and delay competitors from entering the market, and threating to not deal with entities who work with the Doctors.

206. By reason of the alleged violations of the antitrust laws, the Doctors have been injured by having their relationships with patients disrupted.

207. The violations also caused a delay in the Doctors' attempts to reenter the Ross County marketplace.

208. Adena and Maximum Properties' anticompetitive conduct has reduced the supply of orthopedic services in the relevant market and led to the substitution of the Doctors' high quality and experienced services with lower quality providers.

209. As a direct and proximate result of Adena's and Maximum Properties' anticompetitive conduct, the Doctors have been injured in their business or property and will continue to be injured by having lost certain patients that they would have otherwise have derived income from in the future.

210. As a direct and proximate result of Adena's and Maximum Properties' anticompetitive conduct, Great Seal Medical's efforts to open a specialty orthopedic healthcare facility were delayed for several years. This has resulted in injury to Great Seal by delaying its ability to derive profits from operating the facility.

211. As a direct and proximate result of Adena's and Maximum Properties' anticompetitive conduct, CohenOrthopedics experienced delays and additional costs in procuring a property for a specialty orthopedic healthcare facility. This has resulted in injury to CohenOrthopedics by delaying its ability to procure the land for such a facility.

212. Adena and Maximum Properties' monopolistic conduct in the market for orthopedic services violates Section 2 of the Sherman Act.

213.    Accordingly, the Doctors, Great Seal Medical, and Cohen Orthopedics request monetary damages against Adena and Maximum Properties for the harms the Doctors have suffered as a result of these violations of Section 2 of the Sherman Act.

### Count II – Attempted Monopolization of the Market for Orthopedic Services under Section 2 of the Sherman Act

214.    The allegations included in paragraphs 1 to 213 above are incorporated herein.

215.    The relevant product market is the market for inpatient and outpatient orthopedic/musculosketal surgery and related orthopedic services delivered by orthopedic specialists within an integrated orthopedic medical practice.

216.    The relevant geographic market is Ross County and the rest of the Primary Adena Market Area and the Adena Attempted Monopoly Area

217.    Adena's high market share in orthopedic services of over 60% for Ross County and dominant market share in the adjacent counties, when combined with its dramatic lead in market share over the next largest provider mean it has a dangerous probability of success in monopolizing orthopedic services.  This is only enhanced by Adena possessing more operating rooms than all of its competitors in the relevant market put together.

218.    Adena has engaged in anticompetitive conduct to acquire or maintain this market monopoly power by utilizing Maximum Properties to acquire real estate to block competitors.

219.    Adena also engaged in anticompetitive conduct by selectively enforcing noncompetition covenants for the Doctors to bar competitors from hiring them to work in the market, defaming the Doctors to destroy their reputation in the market, and using litigation and abusive discovery to deter and delay competitors from entering the market.

220.     Adena's and Maximum Properties' anticompetitive conduct has reduced the supply of orthopedic services in the relevant market and led to the substitution of the Doctors' high quality and experienced services with lower quality provisions.

221.     As a direct and proximate result of Adena's and Maximum Properties' anticompetitive conduct, the Doctors have been injured in their business or property and will continue to be injured by having lost certain patients that they would have otherwise have derived income from in the future.

222.     As a direct and proximate result of Adena's and Maximum Properties' anticompetitive conduct, Great Seal Medical and CohenOrthopedics have been injured by their delay in opening an orthopedic facility from which they will derive profits.

223.     Adena's and Maximum Properties' attempt at monopolizing orthopedic services violates Section 2 of the Sherman Act.

224.     Accordingly, the Doctors, Great Seal Medical, and CohenOrthopedics request monetary damages against Adena and Maximum Properties for the harms they have suffered as a result of these violations of Section 2 of the Sherman Act.

### Count III –Monopolization of the Market for Orthopedic Physicians under Section 2 of the Sherman Act

225.     The allegations included in paragraphs 1 to 224 above are incorporated herein.

226.     The relevant product market is the market for the employment of orthopedic specialists working in an integrated orthopedic medical practice.

227.     The relevant geographic market is Ross County and the adjacent counties of Pickaway, Hocking, Vinton, Jackson, Pike, Highland, and Fayette County.

228.     Because an integrated orthopedic medical practice needs surgical rooms, the only competitors of Adena in the relevant geographic area are the employers that possess such rooms

in the market — OhioHealth, Hocking Hospital, and Highland Hospital. Adena has more operating rooms in the market than all of these competitors put together. Adena also employs more orthopedists and sports medicine doctors within this market than all of the competitors do within this market combined, even after taking into account that the three Doctors were able to join Ohio Health and return part-time to Ross County.

229. Adena has shown it has monopolistic power in this market by being able to block competitors from leasing office space in this market, and by using noncompete covenants and litigation to dissuade other providers from opening practices in the relevant geographic market.

230. Adena has engaged in anticompetitive conduct to acquire or maintain this market monopoly power by utilizing Maximum Properties to acquire real estate to block competitors.

231. Adena also engaged in anticompetitive conduct by selectively enforcing noncompetition covenants for the Doctors to bar competitors from hiring them to work in the market, defaming the Doctors to destroy their reputation in the market, and using litigation and abusive discovery to deter and delay competitors from entering the market. Using this power, Adena and Maximum Properties have indefinitely delayed Plaintiffs' efforts to establish a competing practice in Ross County.

232. Adena's and Maximum Properties anticompetitive conduct has reduced the supply of employers of orthopedic specialists working in an integrated orthopedic medical practice in the relevant geographic market. By reducing competition in these markets, it also reduces the salaries to these professionals. This in turn ultimately hurts the supply of orthopedic services to patients and diminishes their choices.

233. As a direct and proximate result of Adena's and Maximum Properties' anticompetitive conduct, the Doctors have been injured in their business or property and will

continue to be injured by having fewer options to practice in the relevant marketplace and reduced wages.

234.    Adena's and Maximum Properties' monopolization of the market for orthopedic physicians violates Section 2 of the Sherman Act.

235.    Accordingly, the Doctors request monetary damages against Adena and Maximum Properties for the harms the Doctors have suffered as a result of these violations of Section 2 of the Sherman Act.

### Count IV – Attempted Monopolization of the Market for Orthopedic Physicians Under Section 2 of the Sherman Act

236.    The allegations included in paragraphs 1 to 235 above are incorporated herein.

237.    The relevant product market is the market for the employment of orthopedic specialists working in an integrated orthopedic medical practice.

238.    The relevant geographic market is Ross County and the adjacent counties of Pickaway, Hocking, Vinton, Jackson, Pike, Highland, and Fayette County.

239.    Because an integrated orthopedic medical practice needs surgical rooms, the only competitors in the relevant area with Adena are the employers that possess such rooms in the market — OhioHealth, Hocking Hospital, and Highland Hospital.  Adena has more operating rooms in the market than all of these competitors put together.  Adena also employs more orthopedists and sports medicine doctors within this market than all of the competitors do within this market combined, even after taking into account that the three Doctors were able to join Ohio Health and return part-time to Ross County.  This provides Adena has a dangerous possibility of acquiring monopolistic power in this market.  This probability is enhanced even further by Adena's dominant share of hospital beds and the provision of many other medical

specialties within the area, which it can leverage to keep out competitors by starving them of patients.

240.    Adena has engaged in anticompetitive conduct to acquire or maintain this market monopoly power by utilizing Maximum Properties to acquire real estate to block competitors. Adena also engaged in anticompetitive conduct by selectively enforcing noncompetition covenants for the Doctors to bar competitors from hiring them to work in the market, defaming the Doctors to destroy their reputation in the market, and using litigation and abusive discovery to deter and delay competitors from entering the market.

241.    Adena's and Maximum Properties' anticompetitive conduct in attempting to monopolize the market for orthopedic specialists working in an integrated orthopedic medical practice has reduced the employment opportunities and salaries for orthopedists.

242.    As a direct and proximate result of Adena's and Maximum Properties' anticompetitive conduct, the Doctors have been injured in their business or property and will continue to be injured by having fewer options to practice in the relevant marketplace and reduced wages.

243.    Accordingly, the Doctors request monetary damages against Adena and Maximum Properties for the harms they have suffered as a result of these violations of Section 2 of the Sherman Act.

## REQUEST FOR RELIEF

Wherefore, the Doctors, Great Seal Medical, and Cohen Orthopedics request judgment against Adena and Maximum Properties as follows:

A.    The unlawful conduct alleged herein be adjudged and decreed to violate Section 2 of the Sherman Act;

B.     The Doctors recover damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of them be entered against Defendants in an amount to be trebled to the extent such laws permit;

C.     Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from continuing in any manner the unlawful conduct alleged herein;

D.     The Doctors recover their costs of suit, including reasonable attorneys' fees as provided by law; and

E.     The Doctors have such other and further relief as the Court may deem just and proper.

Dated:  July 5, 2023                              Respectfully submitted,

                                                   s/ Jeffrey A. Lipps
                                                  Jeffrey A. Lipps (0005541) (trial attorney)
                                                  Jennifer A. L. Battle (0085761)
                                                  David A. Beck (0072868)
                                                  Carpenter Lipps & Leland LLP
                                                  280 North High Street, Suite 1300
                                                  Columbus, OH  43215
                                                  (614) 365-4100
                                                  (614) 365-9145 – Fax
                                                  lipps@carpenterlipps.com
                                                  battle@carpenterlipps.com
                                                  beck@carpenterlipps.com

                                                  *Counsel for Plaintiffs Drs. Brian S. Cohen, Aaron M. Roberts, J. Troy Thompson, Great Seal Medical Group LLC, and CohenOrthopedics LLC*

### JURY DEMAND

Plaintiffs Dr. Brian S. Cohen, Aaron M. Roberts, J. Troy Thompson, Great Seal Medical Group, LLC, and CohenOrthopedics LLC, by and through counsel, hereby demand a trial by jury on all issues of this matter.

*s/ Jeffrey A. Lipps*
One of the Attorneys for Plaintiffs Drs. Brian S. Cohen, Aaron M. Roberts, J. Troy Thompson, Great Seal Medical Group, LLC, and CohenOrthopedics LLC
