## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**BRIAN S. COHEN, M.D.,** *et al.,*

       **Plaintiffs,**         :

**v.**                                **Case No. 2:23-cv-02145**
                                    **Judge Sarah D. Morrison**
                                    **Magistrate Judge Chelsey M.**
**ADENA HEALTH SYSTEM,** *et*                **Vascura**
*al.,*                            :

       **Defendants.**

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (Mot., ECF No. 5). Plaintiffs responded (Resp., ECF No. 8), and Defendants filed their reply (Reply, ECF No. 12). This matter is ripe for consideration. For the reasons set forth below, the Motion is **GRANTED**.

## I.    FACTUAL BACKGROUND

The following summary draws from the allegations in the Complaint (Compl., ECF No. 1 (redacted) / ECF No. 7-1 (sealed)), as well as any documents integral to and incorporated therein.

### A.    Adena's Market Area

Adena Health System is a non-profit regional healthcare system that serves rural populations in southern Ohio. (Compl. ¶¶ 3–4, 6.) Its physicians are employed

by Adena Medical Group, LLC (together with Adena Health System, "Adena"). (ECF No. 1, PAGEID # 1 n.1; ECF No. 7-1, PAGEID # 172 n.1.)

According to the Complaint, "[t]hroughout the relevant time period, Adena has held a dominant position in the market for health care services—and, specifically, orthopedic services offered in an integrated practice—in … the Primary Adena Market Area," which encompasses Ross, Pike, Jackson, Highland, and Vinton counties. (Compl. ¶¶ 1, 21, 23.) The Complaint alleges that Adena has endeavored to expand its dominance in an "Attempted Adena Monopoly Area," which includes Fayette, Pickaway, Scioto, and Hocking counties. (*Id.* ¶¶ 6, 24, 49.) The total population residing in these counties (excluding Scioto) was estimated in 2021 to be 309,077 individuals. (*Id.* ¶ 26.)

All of Adena's facilities are located in either the Primary Adena Market Area or the Attempted Adena Monopoly Area (together, the "Adena Market Area"). (Compl. ¶ 28.) There are two competing non-Adena facilities within the Primary Adena Market Area: Holzer Medical Center Jackson in Jackson County and Highland District Hospital in Highland County. (*Id.* ¶ 37.) The Attempted Adena Monopoly Area houses two additional competing facilities: Hocking Valley Community Hospital in Hocking County and OhioHealth Berger Hospital in Pickaway County. (*Id.* ¶ 38.) The following map details the relevant medical facilities located in the Adena Market Area:

2



(*Id.* ¶ 25.) In total, the four non-Adena facilities provide 13 operating rooms and "have a combined total of 85 medical surgical beds and 12 ICU/CCU beds." (*Id.* ¶¶ 39, 41 (emphasis omitted).) By contrast, Adena's facilities provide 16 operating rooms and have "244 medical/surgical beds and 18 ICU/CC beds." (*Id.* ¶¶ 40–41.) None of the non-Adena facilities have an orthopedic doctor practicing full-time in the Adena Market Area,[1] while Adena employs eight orthopedic doctors who practice exclusively in the Adena Market Area. (*Id.* ¶ 42.)

The Primary Adena Market Area—and Ross County in particular—is "predominantly rural, poor, and medically underserved" with an "extreme need" for orthopedic services for patients with limited access to transportation. (*Id.* ¶¶ 4–5, 44–48.) The Health Resources and Services Administration of the U.S. Department

---

[1] Highland District Hospital and Holzer Medical Center Jackson each employ a part-time orthopedist. (Compl. ¶ 42.) Hocking Valley Community Hospital employs two part-time orthopedic doctors. (*Id.*)

of Health and Human Services has designated much of the area in and around Ross County as a "Medically Underserved Area." (*Id.* ¶ 44.) Many patients have insurance through Medicare or Medicaid or are uninsured entirely. (*Id.* ¶ 47.)

In 2018–2019, Adena controlled 64.6% of the market for orthopedic services in Ross County, and no competing hospital system held more than 16.8% of the market. (Resp., PAGEID # 226–27.) From 2019 through 2021, Adena performed "almost 54% by charges of all orthopedic services" in the Primary Adena Market Area. (Resp., PAGEID # 227.)

## B. Adena's Conduct to Protect Its Dominance

The Complaint describes Adena's goal of "limit[ing] competitor access" to the Adena Market Area and recounts the actions Adena took to protect its dominant position. (Compl. ¶¶ 7, 53.) First, Adena "worked to stop or delay its potential competitors from securing real estate" (*id.* ¶ 67) by, among other things:

- Purchasing Fayette Memorial Hospital, located within the Adena Market Area, to "prevent" Dayton-based Kettering Hospital from acquiring it, and, upon the purchase, "prohibit[ing] Fayette County from allowing any county owned real estate to be leased or sold to a competing health care provider" (*id.* ¶¶ 54–58 (emphasis omitted));

- Leasing a building in Chillicothe to "prevent[] OhioHealth and others from doing so" (*id.* ¶ 64); and

- Purchasing a property (the "Prairie Run North Property") in Chillicothe through its subsidiary, Maximum Properties, LLC, because

4

Adena believed the property was "an ideal location for a competitor" (*id.* ¶¶ 70–80).

Second, Adena engaged in employment practices designed to "stifle competition" (*id.* ¶ 102), such as:

- Selectively enforcing restrictive covenants outlined in Physician Employment Agreements, such as non-competition restrictions lasting one year and restrictions on the solicitation of patients and employees (*id.* ¶¶ 82–97);

- Requiring physicians to refer patients needing additional care only to other Adena physicians unless there is no Adena physician offering the necessary services (*id.* ¶¶ 103–108); and

- Providing Adena employees different coverage for out-of-network expenses if they "go to" Adena as compared to Ohio State or other providers "who Adena perceives as competitors" (*id.* ¶ 109).

Finally, Adena began construction in 2019 of the Adena Orthopedic and Spine Institute. (Compl. ¶ 22.) In connection with this project, Adena entered into agreements with Ross County, under which the county offered $83,270,000 in tax-exempt special revenue bonds that Adena was to repay under a sublease and a promissory note. (*Id.*) The Complaint alleges that "a monopoly position in the market for orthopedic services will help Adena repay these bonds." (*Id.*)

### C.    Adena's Actions Toward Plaintiffs

The individual Plaintiffs in this case are Doctors Brian S. Cohen, Aaron M. Roberts, and James Troy Thompson (collectively, the "Doctors").[2] (Compl. ¶ 1.) Dr. Cohen is an orthopedic surgeon who possesses "unique" surgical skills and who was "sought after by many patients across the region" during his 20+ years at Adena. (*Id.* ¶¶ 112–14.) Dr. Roberts is a non-operative sports medicine physician who worked at Adena for approximately 13 years. (*Id.* ¶¶ 116–17.) Dr. Thompson is also a non-operative sports medicine doctor who worked at Adena for approximately 11 years and who has specialized training in various injections and other orthopedic procedures. (*Id.* ¶¶ 118–21.)

Over time, the Doctors "grew frustrated … with the lack of support they received from Adena's administration." (Compl. ¶ 122.) They decided to resign, but before doing so, they began negotiating with OhioHealth for future employment upon the expiration of the non-compete restrictions in their agreements with Adena. (*Id.* ¶¶ 124–25.) The Doctors and OhioHealth also discussed a potential joint venture to open an orthopedic services and ambulatory surgery facility in Ross County, possibly using the Prairie Run North Property. (*Id.* ¶¶ 126–28, 135–36.) In March 2021, the Doctors tendered their resignations, giving the required 120 days' notice. (*Id.* ¶ 131.)

---

[2] The other Plaintiffs are Great Seal Medical Group, LLC (an entity the Doctors own or participate in) and CohenOrthopedic, LLC (Dr. Cohen's individual practice). (Compl. ¶¶ 1, 138.)

The Doctors contend that Adena had suspected they had a relationship with OhioHealth, such that their resignations "spurred a fresh slate of anticompetitive activity by Adena." (Compl. ¶ 134.) Less than thirty days after the Doctors resigned, Adena terminated them, which termination was effective immediately and resulted in the Doctors losing the ability to communicate with their patients. (Compl. ¶¶ 143, 147–48.) The Doctors assert that Adena directed its employees to make it appear as though the Doctors had "walked off the job, abandoning their patients in contravention of their ethical and legal obligations." (*Id.* ¶ 165.)

In addition, as referenced above, Adena outbid OhioHealth for the Prairie Run North Property, derailing the joint venture discussions between OhioHealth and the Doctors. (Compl. ¶¶ 135–36.) When Dr. Cohen was able to secure an alternative parcel more than 18 months later, OhioHealth declined to contribute to the purchase price, so CohenOrthopedic purchased the land; an orthopedic services facility is scheduled to open at the end of this year. (*Id.* ¶¶ 138–41.)

The Complaint also alleges that Adena interfered with a potential consulting relationship in connection with the orthopedic services facility venture, purchased Google advertisements for itself to the detriment of Dr. Cohen and CohenOrthopedic, and spread false information about Dr. Cohen and his colleagues. (Compl. ¶¶ 177–88.)

Since the expiration of their non-compete restrictions, the Doctors have provided services on a part-time basis in the Primary Adena Market Area, but Dr. Cohen has performed all of his surgeries elsewhere. (Compl. ¶ 42.)

## II.    PROCEDURAL HISTORY

Immediately after terminating the Doctors, Adena filed suit against them in state court. *See Adena Health System, et al. v. Cohen, M.D., et al.*, Ross C.P. No. 21CI000091 (Apr. 12, 2021). Adena alleged that the Doctors breached certain provisions of their employment agreements. (Compl. ¶ 152.) The Doctors answered and asserted several counterclaims, including a federal antitrust claim. (*Id.* ¶ 152 n.3.) The parties conducted much discovery,[3] but on November 1, 2022, the state court dismissed the antitrust counterclaim without prejudice for lack of subject matter jurisdiction. (*Id.* ¶¶ 152 n.3, 171–73.) Many of the other original claims and counterclaims remain pending before the state court. *See* Order Postponing Trial, *Adena Health System*, Ross C.P. No. 21CI000091 (July 31, 2023).

On July 5, 2023, Plaintiffs commenced the instant federal action against Adena and Maximum. (Compl., *generally*.) They allege four claims under Section 2 of the Sherman Act: Actual and Attempted Monopolization of the Market for Orthopedic Services (Counts I and II) and Actual and Attempted Monopolization of the Market for Orthopedic Physicians (Counts III and IV). (*Id.* ¶¶ 199–243.) Plaintiffs seek injunctive relief and treble damages. (*Id.*, Request for Relief.)

Adena and Maximum now move to dismiss all claims against them.

---

[3] In addition to the conduct described above, Plaintiffs argue that Adena "perverted the discovery process in the state court action" by "intentionally pursuing aggressive discovery against OhioHealth" and "using litigation and abusive discovery to deter and delay competitors from entering the market." (Compl. ¶¶ 170–80, 194, 205, 219, 231, 240; Resp., PAGEID # 240 n.5.)

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) requires a plaintiff to plead each claim with sufficient specificity to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal alteration and quotations omitted). A complaint which falls short of the Rule 8(a) standard may be dismissed if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The Supreme Court has explained:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotations omitted). The complaint need not contain detailed factual allegations, but it must include more than labels, conclusions, and formulaic recitations of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555.) "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* In reviewing a motion to dismiss, the Court "construe[s] the complaint in the light most favorable to the plaintiff[.]" *DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).[4]

---

[4] Defendants move to dismiss under both Rule 12(b)(1) and Rule 12(b)(6). Defendants initially argue for Rule 12(b)(6) dismissal in part because of Plaintiffs'

## IV.    ANALYSIS

### A.    Plaintiffs lack antitrust standing.

"[A]ntitrust standing and Article III standing are not one and the same," and

courts "not only may—but [] must—reject claims under Rule 12(b)(6) when antitrust

standing is missing." *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 449 (6th Cir. 2007); *see*

*also id.* at 450 ("[W]hen a complaint by its terms fails to establish this requirement

we must dismiss it as a matter of law."). Indeed, "federal courts have been

reasonably aggressive in weeding out meritless antitrust claims at the pleading

stage" due to lack of antitrust standing. *Id.* at 450 (internal quotations and citation

omitted). Thus, before determining whether Plaintiffs' Complaint asserts the

elements of a Sherman Act claim, the Court must first examine the "threshold,

pleading-stage inquiry" of antitrust standing. *Id.*; *Wagner v. Circle W. Mastiffs*, 732

F. Supp. 2d 792, 800 (S.D. Ohio 2010) (Smith, J.).

The Supreme Court has articulated certain factors to be analyzed in

determining whether a plaintiff has established antitrust standing. *See Associated*

*Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S.

_____

"failure to plausibly plead antitrust standing and injury." (Mot., PAGEID # 74.) A few pages later, however, Defendants seek dismissal pursuant to Rule 12(b)(1) "based upon a lack of standing." (*Id.*, PAGEID # 79.) Defendants were correct in the first instance—courts generally consider questions of antitrust standing under Rule 12(b)(6), not Rule 12(b)(1). Because the only other basis Defendants identify in support of Rule 12(b)(1) dismissal concerns the Sherman Act's interstate commerce requirement—which is an element properly evaluated as part of a merits analysis that the Court need not address considering its conclusions detailed below on the preliminary standing inquiry—the Court considers Defendants' Motion under Rule 12(b)(6) only.

519, 537–45 (1983); *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d

972, 976 (6th Cir. 2000). These factors include:

> (1) the causal connection between the antitrust violation and harm to
> the plaintiff and whether that harm was intended to be caused; (2) the
> nature of the plaintiff's alleged injury including the status of the
> plaintiff as consumer or competitor in the relevant market; (3) the
> directness or indirectness of the injury, and the related inquiry of
> whether the damages are speculative; (4) the potential for duplicative
> recovery or complex apportionment of damages; and (5) the existence of
> more direct victims of the alleged antitrust violation.

*Southaven Land Co., Inc. v. Malone & Hyde, Inc.*, 715 F.2d 1079, 1085 (6th Cir.

1983) (citing *Associated General Contractors*, 459 U.S. at 537–45).

Courts in this circuit have interpreted these five factors as creating a two-

part inquiry, such that to have antitrust standing, a plaintiff must (1) prove an

antitrust injury; and (2) demonstrate that they are the proper party to bring the

antitrust suit. *See, e.g.*, *White Mule Co. v. ATC Leasing Co. LLC*, 540 F. Supp. 2d

869, 884 (N.D. Ohio 2008)*; Nilavar v. Mercy Health Sys. W. Ohio*, 142 F. Supp. 2d

859, 869 (S.D. Ohio 2000) (Rice, J.) (citations omitted); *Leak v. Grant Med. Ctr.*, 893

F. Supp. 757, 762 (S.D. Ohio 1995) (Smith, J.), *aff'd*, 103 F.3d 129 (6th Cir. 1996);

*Re/Max Int'l v. Realty One*, 900 F. Supp. 132, 145 (N.D. Ohio 1995) (internal

quotations and citation omitted) ("Where the parties challenge standing at the

pleading stage, the court must examine the allegations contained in the complaint

to determine first whether the plaintiff has presented a proper claim for antitrust

injury before asking whether the plaintiff is the proper party to bring suit."). Here,

Plaintiffs have not satisfied either of these requirements.

### 1.    Antitrust Injury

A showing of antitrust injury is "necessary" to establish antitrust standing. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986); *see also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 477 (1982) ("Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property."). An antitrust plaintiff "must show more than merely an 'injury causally linked' to a competitive practice"—rather, a plaintiff must "prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *NicSand,* 507 F.3d at 450 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977) (emphasis in original)); *see also Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (internal citations omitted) (noting that an injury "will not qualify as antitrust injury unless it is attributable to an anti-competitive aspect of the practice under scrutiny").

Antitrust laws "were enacted for 'the protection of *competition* not *competitors*.'" *Brunswick Corp.*, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320 (1962) (emphasis in original)). A plaintiff alleging antitrust injury "must allege injury to a relevant market, not just injury to the plaintiff." *Wagner*, 732 F. Supp. 2d at 801 (citing *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 434 (6th Cir. 2008)); *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) (observing that purpose of Sherman Act "is not

to protect businesses from the working of the market; it is to protect the public from the failure of the market."). To sufficiently allege harm to the relevant market, "a plaintiff must put forth factual allegations plausibly suggesting that there has been an adverse effect on prices, output, or quality of goods in the relevant market as a result of the challenged actions." *Guinn v. Mount Carmel Health*, No. 2:09-cv-226, 2012 WL 628519, at *4 (S.D. Ohio Feb. 27, 2012) (Sargus, J.) (citations omitted). Otherwise, "routine disputes between business competitors would be elevated to the status of an antitrust action, thereby trivializing the Act[.]" *Indeck*, 250 F.3d at 976.

A "naked assertion" of antitrust injury is insufficient. *NicSand*, 507 F.3d at 451 (quoting *Twombly*, 550 U.S. at 557). An antitrust plaintiff must put forth factual "allegations plausibly suggesting (not merely consistent with)" antitrust injury. *Twombly*, 550 U.S. at 557; *see also Gentile v. Fifth Ave. Otolaryngology, Inc.*, No. 4:05-cv-2936, 2006 WL 2505915, at *3 (N.D. Ohio Aug. 28, 2006) (internal quotations and citation omitted) ("[T]he price of entry, even to discovery, [in an antitrust action] is for the plaintiff to allege a factual predicate concrete enough to warrant further proceedings, which may be costly and burdensome.").

In this case, Plaintiffs argue that they have adequately pleaded antitrust injury. (Resp., PAGEID # 236–37.) Upon review, the Complaint alleges that Adena's "anticompetitive conduct" directly harmed Plaintiffs' reputations and relationships with patients, future employers, and other entities; denied them the opportunity to "service their historic markets for the year they were subject to the noncompete"; caused them to lose potential earnings from working in the area and potential

13

returns from the orthopedic services facility; and "hamper[ed] their ability to compete with Adena for many years into the future." (Compl. ¶¶ 180, 190–97.) These actual injuries may confer Article III standing, but for Plaintiffs to prevail on their antitrust claims, the Court must ascertain whether Adena's alleged conduct caused injury "of the type the antitrust laws were intended to prevent"—i.e., reduced competition in the relevant market. *Brunswick Corp.*, 429 U.S. at 489.

To this point, the Complaint more broadly asserts that Adena "delayed Plaintiffs' reentry into the market and reduced the supply and accessibility of high-quality orthopedic services to patients in Southern Ohio." (Compl. ¶ 193.) Plaintiffs claim that "[p]atients in turn have been harmed by having fewer and less qualified service options during the period the Doctors were prohibited from competing," and "[p]atients also have suffered since the noncompete period expired by the Doctors not having access to surgical space in Ross County, resulting in them getting lower quality medical care." (*Id.* ¶ 195.) Plaintiffs also consider the 18-month delay of the construction of the orthopedic services facility to be a "consequence[] to patient care." (Resp., PAGEID # 236 (citing Compl. ¶¶ 135–41).) By engaging in this conduct, Plaintiffs conclude, Adena has stifled competition in an "extremely underserved" area, leading to "limit[ed] choice, access, and quality of care" for patients. (*Id.*; Compl. ¶¶ 192–93, 195.)

At bottom, the Complaint indicates that Adena disrupted the "choice, access, and quality of care" in the Ross County market and surrounding areas primarily because patients could not utilize the Doctors' services for a certain time following

14

their departure from Adena. (Compl. ¶¶ 192–95.) Although these contentions are consistent with antitrust injury, the Complaint's factual allegations do not adequately support them to avoid dismissal.

Looking first to the harm to the "supply and accessibility" of care, the Complaint fails to allege sufficient facts as to the reduction of competition in the market beyond explaining that patients no longer had the option of seeing the Doctors in the Adena Market Area during the year-long non-compete period. (Compl. ¶ 193); *see also Guinn,* 2012 WL 628519, at *6 ("It is the impact upon competitive conditions in a definable market which distinguishes the antitrust violation from the ordinary business tort."). But Plaintiffs acknowledge that there are four Adena and four non-Adena medical centers from which patients in the Adena Market Area could choose. (*Id.* ¶ 25.) For this reason, Adena's removal of the Doctors as competitors did not eradicate competition between Adena and other doctors in the area nor did it prevent patients from choosing from non-Adena doctors during the one-year restriction period—Plaintiffs admit that several of the non-Adena facilities employ orthopedic physicians (even if only part-time) and offer operating rooms. (*Id.* ¶ 42); *see Guinn*, 2012 WL 628519, at *6. Generally, "the elimination of a single competitor, standing alone, does not prove anticompetitive effect." *Guinn*, 2012 WL 628519, at *6 (citing cases); *Gentile*, 2006 WL 2505915, at *6 (internal quotations and citation omitted) ("In absence of a showing that the market as a whole has been affected, the mere fact that one disappointed competitor must practice elsewhere does not constitute an antitrust injury.").

What's more, the Doctors resumed practicing in the Primary Adena Market Area following the expiration of their non-compete restrictions, and the orthopedic services facility is set to open later this year. (Compl. ¶¶ 42, 138–41, 228.) Plaintiffs allege that the Doctors (and thus their patients) do not have access to surgical space in Ross County since they have returned (*id.* ¶ 195), but they fail to explain how this lack of surgical space is connected to the non-compete restrictions or Adena's other actions. The Complaint is silent as to the extent to which the Doctors were practicing elsewhere during their non-compete period, whether and to what extent patients will utilize the orthopedic services facility, and, most pertinently, the extent to which patients were in fact affected before and after the Doctors' return to the Primary Adena Market Area.

Plaintiffs' arguments surrounding the harm to the quality of patient care fare no better. Initially problematic, there is a dearth of allegations that patients suffered any ill effects in the quality of their care by no longer having the Doctors as their physicians. The Complaint notes the Doctors' qualifications and asserts that they provided "high-quality" care. (Compl. ¶¶ 111–21.) But there is little comparison between the Doctors and other physicians in terms of care quality. Plaintiffs emphasize that the only other non-Adena orthopedic doctors only practice part-time in the Adena Market Area. (*Id.* ¶ 42.) This is a contention related to quantity, not quality, and it says nothing about the qualifications of these other non-Adena physicians. Simply highlighting the Doctors' "high-quality" care without

more is the type of "naked allegation" that will not suffice to show antitrust injury. *See, e.g.*, *Guinn*, 2012 WL 628519, at *6–7.

Plaintiffs provide other reasons why they have properly alleged antitrust injury, but none are persuasive. First, Plaintiffs argue that "[a]cts to tie up real estate and prevent a competitor from obtaining access to real estate can constitute an antitrust injury." (Resp., PAGEID # 240.) But even assuming so, Plaintiffs have not sufficiently alleged that Adena's protective real estate purchases harmed *the market* as opposed to the Doctors individually.

Plaintiffs next point to this Court's decisions in *Nilavar* and the Northern District of Ohio's decision in *Defiance Hospital, Inc. v. Fauster-Cameron, Inc.*, 344 F. Supp. 2d 1097 (N.D. Ohio 2004), to support their position that "a hospital's use of contracts to try and exclude doctors from competing in the relevant marketplace can confer antitrust standing." (Resp., PAGEID # 240.) These cases are distinguishable. In *Nilavar*, a radiologist sued a hospital group and a radiology group after the groups entered an exclusive contract for the provision of radiological services to which the radiologist was not a party. *Nilavar*, 142 F. Supp. 2d at 865. Like Plaintiffs here, the radiologist alleged that his ability to compete was restrained, resulting in higher prices, lower quality services, and less choice for consumers and physicians. *Id.* at 874. However, unlike the Complaint here, the radiologist's complaint included factual details supporting these contentions and the actual effect on patient care. *See* Verified Compl., *Nilavar*, 1999 WL 34678618, at ¶¶ 64(a)–(h) (S.D. Ohio) (asserting that quality harmed because "quality assurance

17

and pooling of knowledge [was] drastically reduced" and that "[a] significant number of consumers … now are forced to purchase physician diagnostic radiology services … which they either do not want or would prefer to purchase from other physicians on different terms"). Further, the exclusive agreements in *Nilavar*, as well as the agreements in *Defiance Hospital*, differ from the employment agreement containing non-compete restrictions at issue here.

Finally, Plaintiffs urge the Court to find that "defamatory statements intended to harm a competitor [support] the inference that anticompetitive conduct occurred for purposes of determining if antitrust standing exists." (Resp., PAGEID # 241.) But the Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt v. Crumboch*, 325 U.S. 821, 826 (1945). "Mere allegations of business disparagement are not the type of injuries to competition that the antitrust laws were designed to prevent." *Worldwide Basketball & Sports Tours, Inc. v. Nat'l Collegiate Athletic Ass'n*, No. 2:00-CV-1439, 2002 WL 32137511, at *17 (S.D. Ohio July 19, 2002) (Sargus, J.) (quoting *Re/Max International*, 900 F. Supp. at 159).

## 2. **Proper Party**

If a plaintiff establishes an antitrust injury, a court must then "determine whether any of the other factors, largely relating to the directness and identifiability of the plaintiff's injury, prevent the plaintiff from being an efficient enforcer of the antitrust laws." *White Mule Co.*, 540 F. Supp. 2d at 884. In this case, the conclusion that Plaintiffs have not suffered an antitrust injury is dispositive,

such that the Court need not address these factors or determine whether Plaintiffs would be efficient enforcers of the antitrust laws. However, the Court observes that, even assuming Adena's conduct did harm patients, there are "at least two more easily imagined efficient enforcers ... patients and the government." *Leak*, 893 F. Supp. at 764 (internal quotations and citations omitted); *see also Nilavar*, 142 F. Supp. 2d at 880 (declining to dismiss plaintiff's antitrust claims on efficient enforcer grounds at the motion to dismiss stage but noting the "apparent ... other possible efficient enforcers of the alleged antitrust injuries," including patients and the government).

## V.    CONCLUSION

Plaintiffs have failed to allege antitrust standing. The Court finds that no amendment to the Complaint could cure this failure because the insufficiency lies not in the specific claims but in the nature of the alleged harm. Defendants' Motion to Dismiss is **GRANTED**.

    **IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**